## UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**RACHELL A. STALLWORTH,**

               **Plaintiff,**

**v.**                              **Case No. 3:09cv404/MCR/CJK**

**OKALOOSA COUNTY SCHOOL DISTRICT,**

               **Defendant**.

_____/

### ORDER

      Plaintiff Rachell Stallworth filed this suit against her former employer, Defendant Okaloosa County School District ("School District"), claiming racial discrimination, harassment, and retaliation, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*, & 1981a ("Title VII"); and a state law claim of workers' compensation retaliation, in violation of Florida law, Fla. Stat. § 440.205.  Pending before the court is Defendant Okaloosa County School District's motion for summary judgment (doc. 76).[1]  Having fully considered the record and the arguments of the parties, the court finds that the motion is due to be DENIED in part and GRANTED in part.

**Background**[2]

      Rachell Stallworth is a black woman who worked as a classroom assistant to Janice

---

    [1]  The defendant also filed a motion for summary judgment at Doc. 75, but it appears to be identical to Doc. 76.  Therefore, the Clerk will be directed to terminate the motion filed as Doc. 75 as moot on the court's disposition of Doc. 76 in this order.

    [2]  For the limited purposes of this summary judgment proceeding, the court views "the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party," which in this case is Washington.  *Martin v. Brevard County Pub. Sch.*, 543 F.3d 1261, 1265 (11th Cir. 2008) (internal marks omitted).  The court is mindful that "what is considered to be the facts at the summary judgment stage may not turn out to be the actual facts if the case goes to trial."  *Cottrell v. Caldwell*, 85 F.3d 1480, 1486 (11th Cir. 1996).

Barrow, who is white, in the Teen-Age Parent Program ("TAPP") at Crestview High School, located in Crestview Florida, from August 2005 until the spring of 2008.[3]  Stallworth claims that Barrow created a racially hostile work environment in the TAPP classroom.  During most of this time, Stallworth's daughter attended Crestview High School and spent time after her classes in the TAPP room where Stallworth worked under Barrow.  Stallworth, her daughter, and students in the TAPP room had complained to the School District at various times about Barrow's actions.

According to Stallworth, Barrows treated her "like a nobody" and a "child" and belittled Stallworth on a regular basis.  Barrow treated Stallworth in a rude manner several times a day, yelled at her, and consistently expressed a dislike of Stallworth through her language and demeanor.  Stallworth complains that Arden Farley, the School District's Equity Coordinator, would telephone Barrow nearly every day to verify the time Stallworth arrived.  During the first semester, Barrow refused to allow Stallworth to interact with the students and required Stallworth to remain in the TAPP classroom, even during the lunch break.  Stallworth states that Barrow forced her to sit at a student's desk although the room had two teacher's desks.  Stallworth requested and was given a teacher's desk in the fall of 2007 by Principal Coleman.  Stallworth states that she was denied a key to the classroom until her last semester, in 2008; however, a substitute teacher who was white was given a key.  Stallworth reports that Barrow told her she did not need a key and also said she (Barrow) was afraid something might come up missing if Stallworth had a key.  According to Stallworth, Barrow treated her like a dog, ordering her to "go and fetch" the mail every day in a hateful tone.  Barrow insisted that Stallworth crawl on the floor to plug in electronic equipment on a daily basis, which humiliated Stallworth and made her feel "like a dog."  (Stallworth's Depo. at 121, 240).  Stallworth stated that when she put the

---

[3]  Previously, Stallworth had worked with another TAPP instructor in Fort Walton Beach, where the School District operated a second TAPP classroom.  While in Fort Walton Beach, Stallworth complained multiple times to Arden Farley about inappropriate and offensive conduct by the teacher there, Dawn Hall, who is white. This led to Stallworth's transfer to the Crestview program, but no action was taken against Hall at that time. Stallworth complained about Hall to the state agency, and Hall's employment was eventually terminated.

surge protector on a table to avoid having to crawl on the floor to plug in the equipment, Barrow insisted that it be left on the floor.  Stallworth complains that Barrow frequently rolled her eyes at Stallworth during conversations and generally acted superior.  By way of example, Stallworth asserts that Barrow refused to allow the students in TAPP to participate in certain computer classes until after Barrow herself had been formally trained in the system, and she refused to learn from Stallworth, despite the fact that Stallworth had already been formally trained and had trained other teachers in the School District on the same system.  Additionally, Stallworth stated that throughout her time working as Barrow's classroom assistant, Barrow had insisted to the students that Stallworth was teaching them improperly.  A former student who is black, Dalivia Baker, testified by deposition that Barrow would say things such as, "don't listen to Ms. Stallworth." (D. Baker's Depo. at 33). Baker also testified that she could tell Barrow did not like Stallworth by the way Barrow behaved toward Stallworth.

Stallworth testified that most classes were computer courses, math or physical education, except that in the spring semester of 2006, Barrow began reading Harper Lee's novel, *To Kill A Mockingbird*, aloud in the classroom.  Stallworth testified that Barrow read the book in such a way that, by her demeanor, she directed the racial slur, "nigger" as used in the book, at Stallworth during the reading, even after students voiced discomfort with the use of the word.  Dalivia Baker testified that Barrow would look up and emphasize the racially offensive portions of the book, and that Barrow would turn to look at Stallworth. According to Stallworth, some students intentionally missed school because of the offensive manner in which the book was read.

Stallworth also complains that Barrow ignored Stallworth's daughter, Arraye, when she came to study in the room after school.  Barrow would also keep the lights off in the room.  Stallworth and Arraye testified that Barrow would read by a small light at her desk but keep the other lights off and some days Barrow would lock the classroom door, causing Stallworth's daughter to mistakenly think her mother wanted her to take the bus home. Arraye testified that she observed Barrow and Stallworth almost every day after school and that Barrow consistently treated her mother with disrespect, a superior attitude, and

unpleasant or distasteful looks. She stated that the worst thing Barrow did to them was to keep the lights off after the school day was over. Arraye stated that she complained of this to the principal, Ed Coleman, who did not help her.

Toyoka Parsons, who was employed at Crestview High School as an aid and the mother of a former TAPP student who is biracial, saw Stallworth and Barrow together at the school on one occasion when Stallworth was on the verge of tears; Barrow shrugged her shoulders, threw her hands up, and walked off. Parsons and several other witnesses testified that Barrow treated Stallworth with disrespect, including Desiree Illar, a white former student; Baker and her mother, Kim Baker; and Irene Varner, who is the mother of a former TAPP student who is black. These witnesses (with the exception of Illar, a white student who said there were no black students in her class) also testified that Barrow gave preferential treatment to the white students and referred to the black students as "them" (Stallworth's Depo. at 175) or as "colored" (Parson's Depo. at 44). Stallworth stated that the black students were given more "Fs" on their progress reports than the white students.[4]

Stallworth complained to Principal Coleman about Barrow's reading of *To Kill a Mockingbird*, which she and students found racially offensive, and of her concern that Barrow was favoring the white students. There is also evidence that she complained to Michael Foxworthy, Chief Officer for Human Resources. Student Dalivia Baker complained of the readings to Principal Coleman as well, who stated he referred the complaints to Equity Coordinator Arden Farley. Through Farley, the School District conducted an investigation. Notwithstanding, according to Stallworth, Barrow continued to read the book

---

[4] The Bakers and Varner felt that Barrow treated the black students less favorably than the white students for several reasons. Among other things, Dalivia testified that Barrow required the black students to handwrite their work for their government and math classes, which they were learning from books, while the white seniors were allowed to use the computers to complete their government and math classes. She also stated that the students had segregated arranged seating in the classroom, with the blacks seated near the door and the white students near the window in front of Barrow's desk. Dalivia testified that two favored white students in her class were allowed to spend as much time sleeping in a recliner as they liked in the nursery section of the classroom, contrary to the rules Barrow had set forth for the rest of the group. When it was time to prepare for the FCAT, Dalivia observed that the white students had assigned FCAT practice books, while the black students did not. She also testified that when they were required to read To Kill a Mockingbird, Barrow read the racially offensive parts aloud and did not teach them the moral of the story. Dalivia's mother felt that Barrow was more demanding of the black students. Varner testified that Barrow would roll her eyes at her and treat her with a superior attitude.

in class, and Farley did not interview Stallworth.  Instead, she was contacted by the state agency for Professional Practice, and based on this contact and comments by students and a parent, Stallworth became concerned that the School District considered her to have agitated the student into complaining about Barrow.

Barrow remains the TAPP teacher at Crestview High School.  She has never been disciplined, and Foxworthy has never recommended her for discipline.  Foxworthy admitted it would be inappropriate for a teacher to focus the classroom discussion exclusively on the racist dialogue of a character in *To Kill A Mockingbird*, but stated that more than two students would have to agree that this was occurring before he would conclude the teacher's demeanor in reading the slur out of a book was racially hostile.[5]  *To Kill A Mockingbird* is no longer on the curriculum.  Foxworthy explained there has been "controversy in Okaloosa on *To Kill A Mockingbird* and the use of the term 'nigger' in that book." (Foxworthy's Depo. at 61).  Barrow has not taught from the book since the 2007-2008 school year.

On or about December 10, 2007, Stallworth injured her knee.  She continued to report to work, and, according to Stallworth, Barrow continued to insist that she crawl on the floor to plug in equipment in the classroom.  The School District's risk manager for workers' compensation claims, Jim Palmer, initially agreed that Stallworth could have her surgery in March and recover during spring break, but Stallworth states that he later began demanding that she have the surgery in February.  Palmer told her she would have the surgery when he told her to have it and accused her of being more concerned with her "religious social club" than in returning to work.  He also made a comment to her to the effect that he would see to it that she did not have job to return to.  Stallworth's last day of work before surgery was January 22, 2008.  She exhausted her vacation and sick leave before receiving workers' compensation benefits on March 1, 2008; and her surgery went forward as planned in March 2008.

Stallworth complains that following her surgery, she was required to return to work

---

[5] There is evidence in this case that one student complained about Barrow's reading of the book.

before being personally evaluated by the surgeon in a follow-up visit.  She complains of conduct by Glenda Torres, a nurse case manager consultant or liaison that the School District used to facilitate workers' compensation claims.   The record reflects that Stallworth's doctor, Dr. Richard Sellers, released her to full duty following surgery, without checking any limitations.  According to Stallworth, she returned to bring this to his attention and Torres interfered with her physician-patient relationship by intercepting the release and writing "full duty" on the paper without speaking again with the doctor.  (Stallworth's Depo. at 77).  Stallworth complains that after she began to experience swelling following her return to work, Palmer denied her request to remain home until she could see the doctor, and as a result, she ended up in the emergency room, where the doctor advised her to stay off of work until her knee was better.  The emergency room doctor gave her an excuse for two days off of work.  Stallworth stated that disputes arose between her and Torres when she attempted to communicate with Torres about the emergency room visit after which Stallworth told Dr. Sellers' office that she did not want Torres to attend her appointments any more.  Shortly thereafter, Dr. Sellers refused to treat Stallworth any longer; Stallworth alleges simply that some interference by Torres "poison[ed] the well."  (Stallworth's Depo. at 87).

Kaye McKinley was the School District's Deputy Superintendent.   Her responsibilities included oversight of the TAPP program throughout the district as well as manage its staffing needs.  She stated in her affidavit that, faced with district-wide budget cuts and declining enrollment in the TAPP program, she determined in April 2008 that the TAPP classroom assistant position at Crestview High School could not be justified for the 2008-09 school year.  According to McKinley, she had no contact with Jim Palmer, the workers' compensation risk manager, regarding Stallworth or eliminating the position.  Barrow's only input into the decision was to provide McKinley with the number of students enrolled in the program for the 2008-09 school year.  McKinley stated that at the time she made the decision to eliminate the position, she had no knowledge that Stallworth had suffered a work-related injury or that she had sought workers' compensation benefits or made complaints about the School District's failure to provide workers' compensation

benefits or racial harassment.  To the contrary, Stallworth states in a declaration that she spoke with McKinley about these complaints (regarding both workers' compensation issues and racial harassment in the classroom) on two occasions, once prior to the decision to eliminate her position, and McKinley instructed her to contact Foxworthy, which she did. Principal Coleman testified that he referred the "situation" to McKinley, "just so she would be aware of it," and to Farley, so he could begin to interview students.  (This appears to reference the classroom conflict surrounding Barrow's reading of *To Kill a Mockingbird*, but it is unclear from the deposition excerpt provided.)  (Coleman's Depo. at 12; Doc. 84-4, at 12).  Coleman also had Barrow draft a letter regarding the *To Kill a Mockingbird* classroom situation, which he said he forwarded to McKinley.

Stallworth states that in April 2008, Barrow informed her she would not be returning to the TAPP classroom the following year.  Also in April, she received a letter notifying her that the position was being eliminated.  The elimination of this position caused the School District to place Stallworth in a "no position" status for the 2008-09 school year and on the layoff list.  According to the procedure described by Foxworthy, which was dictated by the union contract and followed in this instance, an employee in this status can "bump" a less senior employee holding a position in the same job category, resulting in the actual layoff of the employee with the least seniority in a particular job category.  Thus, the School District began looking for another position for Stallworth.  Stallworth asserts that Barbara Smallwood, her white counterpart working as a classroom assistant in the Fort Walton High School TAPP classroom, was permitted to retain her position, though she had "only several months more service" than Stallworth. (Stallworth's Decl., at ¶ 8).  Foxworthy testified that all classroom assistants are considered as one category and that Stallworth was eligible to be placed in any teacher assistant position.

According to Stallworth, she returned to work at one location as a classroom assistant but she quit because she had to walk beyond her physical capabilities at the time and thus could not do the job.  The School District then offered her a position of transportation assistant, also called a bus monitor, which was classified the same as a classroom assistant.  Stallworth testified that having done that job in the past, she was

aware that it would require her to bend her knees and move wheelchairs on and off the bus, which she refused to do on grounds that these activities were beyond her physical capabilities.  Foxworthy testified that in making these job offers, he relied on the doctors' recommendations to determine Stallworth's capabilities, not Stallworth's own representation of her capabilities.  He stated that the School District quit having contact with Stallworth after she rejected the alternative job proposal of bus monitor, and that she in turn ended her contact with the school at that point.  Foxworthy was aware of Stallworth's complaints regarding Palmer's conduct and his denial of workers' compensation benefits to which Stallworth felt she was entitled.  Foxworthy also knew that Stallworth had complained of Barrow's racial bias.  Foxworthy testified that he was the decision-maker regarding layoffs, but that he did not eliminate positions.  Kaye McKinley stated in her affidavit that she was the decision-maker regarding the elimination of the Crestview TAPP classroom assistant position, which caused Stallworth to be on "no-position" status.

Stallworth testified that her work environment caused her stress and emotional pain, which resulted in her staying home in bed rather than going to work more than ten times.  She states that her sleep was disturbed and she suffered depression.  In 2008, Stallworth filed a charge of racial discrimination based on her experiences with the School District and harassment by Barrow.

**Discussion**

<u>Objection to Portions of Plaintiff's Declaration</u>

The School District argues that the court should not consider allegations in the plaintiff's declaration regarding complaints she made to Kaye McKinley, arguing that these portions of the declaration are self-serving, factually inaccurate, mischaracterize deposition testimony, and amount to a sham, and that plaintiff should be sanctioned for the failure the disclose the information in Rule 26 disclosures.  There is nothing inherently wrong with considering self-serving testimony at the summary judgment stage.  *See Price v. Time, Inc.*, 416 F.3d 1327, 1345 (11th Cir.), *modified on denial of reh'g on other grounds*, 425 F.3d 1292 (11th Cir. 2005).  However, a party's affidavit that is inherently inconsistent with

that party's prior sworn deposition testimony may be disregarded as a sham if it creates an issue of fact by "merely contradic[ting], without explanation, previously given clear testimony." *Van T. Junkins & Assoc., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657-59 (11th Cir. 1984).  "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986) (internal marks omitted).  The rule is that any issue of fact stated in an affidavit which is "flatly contradicted by an earlier deposition [i]s so suspect of untruthfulness as to be disregarded as a matter of law." *Id.*  However, this court must take care to distinguish between discrepancies that are inherently inconsistent and "create transparent shams" from those that merely "create an issue of credibility or go to the weight of the evidence." *Id.* at 953.

The record shows that on February 17, 2010, the defendant served its Rule 26(a)(1) disclosures on the plaintiff, identifying Kaye McKinley, Deputy Superintendent, as able to testify as to matters related to Stallworth's employment with the School District. Plaintiff's Rule 26 disclosures and supplemental disclosure identify McKinley as having knowledge of the decision not to renew the plaintiff's contract (referencing the April 15, 2008 letter communicating her lay off).  During her deposition on May 28, 2010, Stallworth testified that she had complained to several individuals regarding Barrows' alleged discriminatory treatment or harassment and of issues regarding her workers' compensation claims, and she stated that she had kept a personal diary or list of events that occurred during her employment at Crestview, which she testified was accurate and she did not leave anything out.  When asked if she knew Kaye McKinley, Stallworth testified that she knew her to be the assistant superintendent and Barrow's new boss the last year Stallworth worked at Crestview.  Stallworth explained that there had been some reorganization of management, resulting in McKinley being placed "over both programs administratively."[6]  (Stallworth's Depo. at 216)  Stallworth further explained that although Principal Coleman was "the boss,

---

[6]  As noted previously, there were two TAPP classrooms, one in Crestview High School and another in Ft. Walton Beach, Florida.

boss," McKinley "was, like, over the TAPP program." (*Id.*)  She was asked, "So she was the person within the School District responsible for TAPP?" to which Stallworth answered, "Yes."[7] (*Id.*)  When asked, "Did you know her at all?" plaintiff responded, "No sir.  I know the name, but I don't know her."  (Stallworth's Depo. at 217)

In Stallworth's declaration submitted in opposition to the School District's motion for summary judgment, Stallworth stated that she in fact had two conversations with McKinley in which she expressly told McKinley of her complaints regarding workers' compensation concerns, retaliation, and racial harassment in the classroom.  Stallworth explained the inconsistency by stating that, during the deposition, she had not been specifically asked whether she had spoken with McKinley, only if she knew her, and that she did not previously understand that McKinley might have made the decision to eliminate her position because Foxworthy said he made the layoff determinations.  Stallworth stated in her declaration that she now recalls these conversations with McKinley and asserted that McKinley specifically knew of her work-related injury and complaints regarding workers' compensation and racial hostility in the classroom.

While the Stallworth's sudden recollection of these two conversations is suspect, the court cannot find that her declaration statements are inherently inconsistent with her deposition testimony that she did not know McKinley.  She was not asked whether she had ever spoken with McKinley.  Furthermore, it is plausible that Stallworth simply did not remember these conversations with McKinley at the time of her deposition, that she did not consider them as important because McKinley had told her to call Foxworthy, that she did not feel she knew McKinley after two brief conversations, or that she did not previously make the connection that McKinley's oversight of the TAPP program also made her responsible for determining staffing levels for the program.  Her statement that she did not "know" McKinley is not flatly contradicted by her new recollection of having spoken with her twice.  Instead, the inconsistencies here involve an issue of credibility for a jury and thus

---

[7] Plaintiff's Rule 26 disclosures and her supplemental disclosures identify McKinley as having knowledge of the decision not to renew her contract and "may have other information relevant to the claims of the plaintiff."  (Docs. 85-4 and 85-5)

the issue goes to the weight, not the admissibility, of the evidence.[8]  *See Tippens*, 805 F.2d at 953-55 (explaining that variations in testimony and memory failures go to weight and credibility whereas falsehoods or "flat contradiction[s]" justify disregarding an affidavit as a sham).   Thus the court concludes that Stallworth's declaration is not inherently inconsistent with her sworn deposition testimony and that she has substantially justified the failure to provide it earlier; therefore, the court will not disregard it.[9]

Summary Judgment Standard

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, "shows that there is no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Martin v. Brevard Cnty. Pub. Sch.*, 543 F.3d 1261, 1265 (11th Cir. 2008).  "[T]he substantive law will identify which facts are material" and which are irrelevant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  On summary judgment, the court's function is not to weigh the evidence to determine the truth of the matter, but to determine whether a genuine issue of fact exists for trial.  *See id.* at 249.  An issue of fact is "material" if it is a legal element of the claim under the applicable substantive law that might affect the outcome of the case, and it is "genuine" if the record taken as a whole could lead a rational fact finder to find for the non-moving party.  *See id.* at 248; *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) (en banc).  "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment."  *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust Co. v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)).  The court must view all the evidence, and all factual

---

[8]  Also, to the extent the newly remembered conversations are not recorded in the plaintiff's diary or mentioned in her Rule 26 disclosures, this too presents a matter of credibility.  The diary and Rule 26 disclosures are not the same as prior sworn testimony.

[9]  Regarding statements that the School District asserts mischaracterize the deposition testimony, the court finds that these are minor but to the extent that the plaintiff does mischaracterize the deposition testimony of others in her declaration or memorandum of law, the court has disregarded those statements and relied on the record testimony.

inferences reasonably drawn from the evidence, in the light most favorable to the nonmoving party.  *See Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993).  A mere scintilla of evidence in support of the nonmoving party's position will not suffice to demonstrate a material issue of genuine fact that precludes summary judgment. *See Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

Racial Discrimination and Harassment

Stallworth claims in Count I that the School District engaged in racial discrimination in violation of Title VII[10] by Barrow's conduct of racial harassment in the classroom and the decision to place Stallworth on "no position" status by eliminating the classroom aid position for the Crestview High School TAPP program.  To survive summary judgment on a harassment or hostile work environment claim, the plaintiff must present evidence raising a genuine issue of fact regarding whether "'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).   To meet this legal standard, a plaintiff must demonstrate:

> (1) that [s]he belongs to a protected group; (2) that [s]he has been subject to unwelcome harassment; (3) that the harassment [was] based on a protected characteristic of the employee . . .; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Id.* at 1275.

For purposes of summary judgment, the School District concedes that Stallworth has established the first three components – she is in a protected group, she experienced

---

[10]  The School District assumes that plaintiff has also brought a claim under 42 U.S.C. § 1981, which is analyzed the same as a Title VII claim and need not be separately analyzed.  The court notes, however, that the complaint only cites Title VII and § 1981a, which is the damages provision applicable to Title VII claims, not an independent cause of action.

unwelcome harassment, and that the harassment was based on her race.  The School District argues that she has not presented a question of fact regarding whether the harassment was sufficiently severe and pervasive to have altered the terms or conditions of her employment or whether the employer is responsible for such an environment.  For reasons that follow, the court disagrees.

Title VII's prohibition of discrimination and harassment "is not a federal civility code." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (*en banc*), *cert. denied*, 529 U.S. 1068 (2000).  For this reason, the alleged harassing conduct must be both subjectively and objectively sufficiently severe or pervasive as to alter an employee's terms or conditions of employment.  *Id.* at 1246.  The subjective component is satisfied if the employee perceived the conduct as sufficiently severe or pervasive.  *Id.*  Stallworth has demonstrated that she perceived the conduct as severe and pervasive for summary judgment purposes.  Thus, the court turns to the objective inquiry.

The objective component requires consideration of whether a reasonable person would perceive the environment to be racially hostile or abusive given the totality of the circumstances.  *Id.*  The Supreme Court and Eleventh Circuit have identified four factors courts should consider in determining whether a situation is objectively hostile or abusive: (a) "the frequency of the discriminatory conduct;" (b) the severity of the conduct; (c) whether the conduct "is physically threatening or humiliating, or a mere offensive utterance;" and (d) whether the conduct "unreasonably interferes with an employee's work performance."  *Harris*, 510 U.S. at 23; *see also Mendoza*, 195 F.2d at 1246.  Courts consider the alleged harassing conduct "both cumulatively and in the totality of the circumstances."  *Reeves*, 594 F.3d at 808.  Racially offensive language must rise "above the level of off-handed comments in the course of casual conversation" to be actionable.  *Miller*, 277 F.3d at 1276-77.  While conduct need not be "so extreme that it produces tangible effects on job performance in order to be actionable," there must be evidence that the harassing conduct is frequent, severe, and humiliating in nature such that it interfered with job performance.  *Id.*

Stallworth argues that she suffered a "litany of abuse" each day at work, that the

word "nigger" was directed at her frequently during Barrow's reading from *To Kill a Mockingbird*,  that she was treated like a child and made to sit at a student's desk, that she was told to "fetch" the mail and required to crawl on the floor to plug in computers, that Barrow spoke to her in a superior, rude, and hateful tone even in front of students, and that Barrow's actions such as rolling her eyes when speaking to Stallworth and making Stallworth work in a dark classroom at the end of the day without the benefit of lights cumulatively amounted to pervasive harassment based on race.  The court finds that Stallworth has created a question of fact regarding whether the conduct was objectively hostile.   The conduct was frequent and humiliating, and there is evidence that it unreasonably interfered with Stallworth's job performance.  There is evidence that the students perceived a racist attitude on the part of Barrow and that Barrow treated the students in a racially biased manner.  There was also evidence that Barrow's oral reading of the novel was done in a purposefully harassing manner and that this harassment and the overt racial epithets in the book were repeatedly directed at Stallworth in the classroom, even after students had requested that the teacher alter the reading by saying "n" rather than using the racial epithet, which she refused to do.  The court agrees with Stallworth that this conduct by her supervising teacher in front of the class was not isolated or sporadic and, when combined with the other mean and humiliating incidents that occurred daily, raises a question of fact on the objective component.  *See Miller*, 277 F.3d 1276-77 (finding an objectively hostile atmosphere where "three to four times a day" a foreman and others called plaintiff explicitly racially derogatory terms, plaintiff was forced to interact with the abusers on a daily basis, and the derogatory names were used "in an intimidating manner, shouting them at [plaintiff] during the course of berating him for his job performance");  *Mack v. ST Mobile Aerospace Eng'g, Inc.*, 195 Fed. Appx. 829, 837-38 (11th Cir. 2006) (unpublished)[11] (finding a jury question existed where evidence showed that racial graffiti had permeated the workplace premises for many years; the plaintiffs discovered seven nooses in two years' time; employees and management directed

---

[11]  Under 11th Circuit Rule 36-2, unpublished cases may be cited as persuasive although not binding authority.

offensive words, jokes, and statements to minority employees; and employees were unable to perform their jobs effectively or productively). *But cf. McCann v. Tillman*, 526 F.3d 1370, 1379 (11th Cir.) (holding two or three instances of racially derogatory language alone, extending over a period of two years, was too sporadic and isolated to establish the objective component of a hostile work environment claim), *cert. denied*, 129 S. Ct. 404 (2008). Viewing the totality of the circumstances in the light most favorable to the plaintiff, the court finds that the record contains a question of fact regarding whether the alleged conduct of Barrow was sufficiently severe or pervasive to demonstrate a hostile work environment.

As to Stallworth's claim of discriminatory treatment, Stallworth offers circumstantial evidence of discrimination, which the court views through the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).[12] Under the *McDonnell Douglas* framework, to demonstrate a *prima facie* case of discriminatory treatment based on race, the plaintiff must show: (1) she is a member of a group protected by Title VII; (2) she was qualified for the job or benefit at issue; (3) she was subject to an adverse employment action; and (4) her employer treated similarly situated employees who were not members of the class more favorably. *See Smith v. Lockheed-Martin Co.*, 644 F.3d 1321, 1325 (11th Cir. 2011); *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008); *Gillis v. Ga. Dep't of Corr.*, 400 F.3d 883, 887 (11th Cir. 2005). The burden to set forth "a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997); *see also Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). If the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision. *McDonnell Douglas*, 411 U.S. at 802. If a legitimate reason is articulated, the burden shifts back to the plaintiff to show that the defendant's reason was pretextual. *Id.* At all times, "the ultimate burden of persua[sion]" remains with the plaintiff. *See St. Mary's Honor Ctr.*

---

[12] Stallworth does not argue that she has presented direct evidence of discrimination.

*v. Hicks*, 509 U.S. 502, 507 (1993) (internal marks omitted).

For purposes of summary judgment, the School District concedes that Stallworth has established the elements of the *prima facie* case with the exception of showing that a similarly situated person outside the class was treated more favorably.   In her declaration, Stallworth states that the other TAPP classroom assistant whose position was not eliminated was white, but Stallworth admitted that the other assistant had "several months" more seniority than Stallworth.   In light of Foxworthy's testimony that layoff determinations are made based on seniority under the union contract, the School District argues that Stallworth has not shown that a similarly situated comparator was treated more favorably.   The court disagrees.   A relevant comparator must be an employee who is similarly situated to the plaintiff "in all relevant respects."   *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (internal marks omitted).   The Eleventh Circuit explains that the comparator must be "nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer."   *Id.*   Here, the court finds that the comparator is sufficiently similar to Stallworth for purposes of setting forth a *prima facie* case with regard to the decision to eliminate Stallworth's position.   Despite the comparator's "several months" of seniority, which renders her not similar with respect to the final layoff determination according to Foxworthy's description of the process, McKinley made the decision to eliminate the Crestview TAPP classroom assistant position, and she did not state that the decision was based on seniority.   Instead, McKinley said she based her decision on district-wide budget cuts and declining enrollment in the TAPP program. Thus, the difference in seniority was not a factor that was material to McKinley's decision, and therefore, Stallworth has identified a similarly situated comparator whose position was not eliminated.   Thus, Stallworth has made out a *prima facie* case.

In response, the School District has set forth a legitimate, nondiscriminatory reason for the decision to eliminate Stallworth's position.   As noted above, McKinley stated that the decision was based on her determination that the classroom assistant position at Crestview High School was not justified for the 2008-09 school year due to declining enrollment in the program and in light of district-wide budget cuts.   To avoid summary

judgment, then, Stallworth must present evidence from which a jury reasonably could find that "'the proffered reason was not the true reason for the employment decision . . . either by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir.2005) (quoting *Burdine*, 450 U.S. at 256). Stallworth argues that McKinley's reasons for eliminating the TAPP classroom assistant position at Crestview High School, resulting in Stallworth being "no positioned," are inconsistent with the testimony of Foxworthy, who stated that the layoff process focuses on seniority, not eliminating a particular position.[13] The court sees no inconsistency. Foxworthy was the decision-maker regarding the layoffs, and he testified that a person on the layoff list could "bump" another person who held a job in the same category but had less seniority. He testified that in carrying out his duties, he did not eliminate positions but focused on ensuring that the person with the most seniority in a particular job category retained a job if possible. Nonetheless, there is no question that McKinley had supervisory authority over the TAPP program itself and, consistent with Foxworthy's testimony, McKinley, not Foxworthy, made the decision to eliminate the classroom assistant position at Crestview High School. McKinley said her decision was not based not on seniority (which is a layoff consideration within Foxworthy's duties) but on budget concerns and declining enrollment in the TAPP program which she supervised. Foxworthy's testimony is not inconsistent with McKinley's nor does it demonstrate that McKinley's reasons for eliminating the position are unworthy of credence.

Stallworth asserts that there is no evidence of the School District's budget cuts other than McKinley's conclusory statement. The court finds that the record does include evidence that the School District was having budget problems at the relevant time, despite the fact that the actual budget is not in evidence. Foxworthy testified that there were "huge layoffs that year" due to the School District "having a hard time making the budget."

---

[13] However, if McKinley had considered seniority, Stallworth still would have lost her position because, as Stallworth admits in her declaration, the other TAPP classroom assistant had several months seniority over Stallworth.

(Foxworthy's Depo. at 94).  The record shows that several employees were laid off at that time, and Stallworth presents no evidence to the contrary.  Stallworth also asserts that there is no evidence of declining enrollment in the program to support McKinley's decision to cut her position.  Stallworth presented student testimony that the TAPP class size in Crestview High School had increased, not decreased, the year *prior* to McKinley's decision to eliminate the position.  McKinley relied on a decline in the upcoming year's enrollment in the Crestview class, and Stallworth presents no evidence contradicting that decline or calling into question the truth of this statement.  There is likewise no evidence from which to conclude that there was a greater decline in the enrollment level of the Ft. Walton TAPP classroom for the following year.  The court finds that Stallworth has not presented evidence from which a jury could reasonably find that McKinley's reason for eliminating the Crestview TAPP classroom aid position was not true or that racial discrimination was more likely than not the true reason for the decision.  Thus, the School District is entitled to summary judgment on Stallworth's race discrimination claim insofar as it is based on alleged discriminatory treatment.

Retaliation

In Count II, Stallworth asserts a claim of retaliation in violation of Title VII.  *See* 42 U.S.C. § 2000e-3(a).  A Title VII retaliation claim based on circumstantial evidence is analyzed under the burden-shifting rubric of *McDonnell Douglas* described above, requiring a *prima facie* showing of retaliation and an issue of fact regarding the employer's nondiscriminatory reason for the action to survive summary judgment.  *See Wright v. Southland Corp.*, 187 F.3d 1287, 1305 (11th Cir. 1999).  A *prima facie* case of retaliation requires the plaintiff to show that (1) she engaged in an activity protected under Title VII; (2) she suffered an adverse action; and (3) there was a causal connection between the protected activity and the adverse employment action.  *See Crawford*, 529 F.3d at 970-74 & n.14 (discussing *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)).  To satisfy the third element, a plaintiff must establish that "the decision-makers were aware of the protected conduct and that the protected activity and the adverse action were not wholly unrelated."  *McCann*, 526 F.3d at 1376 (internal marks omitted).  Generally, "close

temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact about a causal connection." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000), *cert. denied*, 582 U.S. 1037 (2001); *see also Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).  As in the discriminatory treatment context, once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate non-discriminatory reason for the adverse action and the plaintiff must then create a question of fact as to whether the articulated reason is a pretext for discrimination in order to survive a motion for summary judgment.  *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).

For purposes of summary judgment, the School District assumes Stallworth has satisfied the first two elements of the *prima facie* case, but argues that there is no causal connection between her complaints of discrimination and the adverse employment action of being "no positioned."  The School District maintains that McKinley had no knowledge of Stallworth's protected activity.  To the contrary, however, Stallworth stated in her declaration that she had spoken with McKinley about her complaint of racial harassment after surgery had been recommended for her knee, which would have been roughly three to four months prior to McKinley's decision to eliminate her position.  Even assuming that this is sufficient to make out a *prima facie* case, however, for reasons previously discussed, Stallworth cannot demonstrate pretext.

To create a genuine issue of material fact on the question of pretext, the plaintiff must "demonstrate weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  *Combs v. Plantations Patterns*, 106 F.3d 1519m 1538 (11th Cir. 1997).  Although there remains a question of fact regarding McKinley's knowledge of Stallworth's complaint, that knowledge and the roughly three to four month proximity are insufficient to create a question of fact on whether the decision was motivated by retaliatory animus.  *See Wascura v. City of South Miami*, 257 F.3d 1238, 1245 (11th Cir. 2001) (stating 3 1/2 month period between knowledge of

a complaint and termination does not, standing alone, show pretext); *Deer v. Saltzman, Tanis, Pittell, Levin & Jacobson, Inc.*, 2011 WL 2672286, at *10 (S.D. Fla. 2011) (stating, "[w]hile close temporal proximity can establish causation, it is not enough, in and of itself to raise a genuine issue of fact as to pretext"); *see also Knight v. Fla. Dep't of Transp.*, 291 Fed.Appx. 955, 960 (11th Cir. 2008) (unpublished) (stating "knowledge alone is not necessarily sufficient once the analysis moves to the pretext stage"); *McCoy v. City of Shreveport*, 492 F.3d 551, 562 (5th Cir. 2007) (holding pretext cannot be demonstrated on a retaliation claim simply by showing that the decisionmaker knew of the protected conduct and took an adverse action shortly thereafter).  Stallworth has presented no evidence from which to find that the nondiscriminatory reasons McKinley cited for eliminating the Crestview classroom assistant position were untrue or unworthy of credence, nor has she presented evidence from which to find that a retaliatory motive was more likely than not the reason for the decision.  The School District, therefore, is entitled to summary judgment on Count II.

Workers' Compensation Retaliation

Stallworth alleges in Count III of the amended complaint that the School District eliminated her position, harassed her, intimidated her, and transferred her to positions beyond her physical abilities in retaliation for her filing a workers' compensation claim under state law.[14]  Under Florida law, "[n]o employer shall discharge, threaten to discharge, intimidate, or coerce any employee by reason of such employee's valid claim for compensation or attempt to claim compensation under the Workers' Compensation Law."  Fla. Stat. § 440.205.  It is well settled that if an employer violates this section, the employee may assert a cause of action for "retaliatory treatment."  *Bifulco v. Patient Business & Fin.*

---

[14]  The court exercises supplemental jurisdiction over this state law claim because the factual basis is intertwined with  the issues over which the court has original jurisdiction.  *See* 28 U.S.C. § 1367(a) (stating, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy"); *see also Coker v. Morris*, No. 3:07cv151, 2008 WL 2856699, at *6 (N.D. Fla. 2008).

*Servs., Inc.*, 39 So. 3d 1255, 1257 (Fla. 2010); *see also Borque v. Trugreen, Inc.*, 389 F.3d 1354, 1357 (11th Cir.2004) (citing *Smith v. Piezo Tech. & Prof'l Adm'rs*., 427 So.2d 182, 183 -84 (Fla. 1983)).  The standard for retaliation in this context is the same as under Title VII.  *See Charlton v. Republic Servs. of Fla., L.P.*, No. 09cv22506, 2010 WL 2232677, at *8 (S.D. Fla. 2010); *Coker v. Morris*, No. 3:07cv151, 2008 WL 2856699, at *7 n.21 (N.D. Fla. 2008).  To demonstrate a *prima facie* case, the plaintiff must show: (1) a statutorily protected activity; (2) an adverse employment action;[15] and (3) a causal connection between the protected expression and the adverse action.  *See Edwards v. Niles Sales & Serv., Inc.*, 439 F. Supp.2d 1202, 1228 (S.D. Fla. 2006) (citing *Russell v. KSL Hotel Corp.*, 887 So.2d 372, 379 (Fla. 3d DCA 2004)).  If the employer offers a legitimate reason for the discharge, the claim survives summary judgment if there is a question of fact on the issue of pretext, that is, whether there is "sufficient evidence to permit a reasonable finder of fact to conclude the employer's proffered reasons were not what motivated its conduct, or that the proffered reasons are not worthy of belief."  *Ortega v. Eng'g Sys. Tech., Inc.*, 30 So. 3d 525, 529 (Fla. 3rd DCA 2010).

There is no dispute that Stallworth filed a workers' compensation claim, that her position was eliminated, and that McKinley and also Foxworthy knew of her injury and complaints.  Thus, she has set forth a *prima facie* case.  However, because the School District has set forth a legitimate nondiscriminatory reason for the employment action, Stallworth must demonstrate a question of fact with regard to pretext.  As to Stallworth's claim for workers' compensation retaliation based on McKinley's decision to eliminate her position, Stallworth has failed to present evidence that the legitimate, nondiscriminatory reasons McKinley stated for eliminating the position were pretextual, as previously discussed.

Stallworth also claims retaliation based on intimidation or coercion by Palmer and

---

[15]   In the Title VII retaliation context, the required adverse action need not adversely affect an employee's conditions of employment, but it must have "a materially adverse effect on the plaintiff, irrespective of whether it is employment or workplace-related."  *Crawford*, 529 F.3d at 973 (citing *Burlington*, 548 U.S. at 68).

Case 3:09-cv-00404-MCR-CJK   Document 110   Filed 09/30/11   Page 22 of 23

Foxworthy's ultimate decision to quit offering her positions within the School District.  As Stallworth asserts, the Florida workers' compensation scheme does support a cause of action for retaliatory intimidation or coercion.  *See Chase v. Walgreen Co.*, 750 So. 2d 93, 95-98 (Fla. 5th DCA 2000) (holding Fla. Stat. § 440.205 is not limited to claims of retaliatory discharge but includes claims for retaliatory intimidation or coercion even where there has been no discharge and in situations where the statute does not otherwise provide a remedy).  The court stated in *Chase* that the Florida "legislature intends to protect the employee's access to [a] worker's compensation remedy and not allow an employer's intimidation or coercion to discourage filing valid claims."  *Id.* at 97-98.  The court finds that Stallworth has created a question of fact regarding causation and pretext as to the conduct of Palmer and Foxworthy with regard to her workers' compensation claim.  Both Palmer and Foxworthy knew of her workers' compensation claim, and Foxworthy knew of her complaints regarding Palmer's conduct.  Palmer allegedly made comments that were intimidating and threatening in connection with Stallworth's injury, her return to work after surgery, and her need to see the doctor again.  Palmer reported to Foxworthy, who admittedly stopped offering Stallworth positions and refused to consider her own complaints that she was physically incapable of performing the jobs she was offered, relying instead on the doctor reports provided by Palmer.[16]   Accordingly, questions of fact remain on this issue and summary judgment is not appropriate on Count III with respect to the conduct of Palmer and Foxworthy.

Accordingly, it is hereby ORDERED that Defendant's motion for summary judgment (doc. 76)[17] is GRANTED on the disparate treatment claim of Count I, the Title VII retaliation claim of Count II, and the workers' compensation retaliation claim based on the elimination

---

[16]   *But cf. Coker v. Morris*, No. 3:07cv151, 2008 WL 2856699, at *7 n.21 (N.D. Fla. 2008) (citing *Montes de Oca v. Orkin Exterminating Co.*, 692 So. 2d 257, 259 (Fla. 3d DCA 1997), rev. denied, 699 So. 2d 1374 (Fla. 1997), and noting that a claim that the employee was not offered a job she was physically capable of performing is the type of dispute that is properly brought before the judge of compensation claims under Fla. Stat. § 440.15(6)).  The court finds that this dispute is not appropriate for the judge of compensation claims because there is no ongoing dispute with the employer for workers' compensation benefits due, and any such claim would not be appropriate in this forum.

[17]   The Clerk is directed to terminate the first-filed motion for summary judgment (doc. 75) as moot.

of the classroom assistant position articulated in Count III.  The motion is DENIED on the hostile work environment claim of Count I and the workers' compensation retaliation claims of coercion and intimidation based on the conduct of Palmer and Foxworthy in Count III.

   **DONE AND ORDERED** this 30th day of September, 2011.


s/ *M. Casey Rodgers*
**M. CASEY RODGERS**
**CHIEF UNITED STATES DISTRICT JUDGE**